310-0700, Ancore Investment Group, Dettol, v. Colonial Acres Healthcare Centre, Inc., Dettol, helped by Kevin Miller and Michael Merzock. Please proceed. Good morning, and may it please the Court. I'm Kevin Miller. I represent the Defendant, Appellant, and Contemnor in this case. Facts can be briefly stated. The plaintiff's ward, the plaintiff is a guardian of Marta Vinson. Marta sustained an injury and came to my client's rehabilitation centre in July 2005. While there, for less than three weeks, she developed a bed sore on her backside, which became infected, required extensive medical treatment. She had a bad result. The plaintiff has sued the rehabilitation centre for alleged improper care. The rehabilitation centre denied improper care and alleged that the injury was caused, in whole or in part, by Mrs. Vinson's own failure to follow her physician's orders and failure to participate in the rehabilitation program prescribed for her. That's the underlying case. During discovery, the discovery phase, written discovery requests were exchanged among the parties. Interrogatories were sent to the rehabilitation centre, asking us to identify a number of people. For example, people who held different positions in the rehabilitation centre from 2003 up to the present. 2003 would be preceding the injury or the occurrence by two years and up to the present. The administrator of the rehabilitation centre, the medical director, the director of nursing, those type of people needed to be identified. They also asked us to identify anyone who saw Mrs. Vinson's wound. We identified those people. We gave the interrogatory answers to the plaintiff, and in response, we received a request to produce. Among other things in the request was 34 personnel files of everybody who had been identified so far, whether they were the administrator at the time of the occurrence or even after the occurrence. Anyone who had come into contact with their, actually, the request for production of the personnel files was even broader than the interrogatories who listed the 34. They wanted the 34 individuals' files as well as anyone who was involved in care, and I think I'm using those words correctly, involved anywhere in care. We objected. We raised four objections, two of which I think are really pertinent here today. The first is that the request was not limited in time to an appropriate time of involvement. The second was that the request was not reasonably calculated to lead to the discovery of admissible evidence and was, within the words of the Appellate Court First District in the Fabiano case, a phishing expedition. After raising those objections, there was a motion to compel. The trial court decided that motion against us on this particular issue in favor of both parties on various issues, but this is the one issue that arose out of that motion to compel just with regard to the personnel files. The court ordered us within 28 days to produce those 34 personnel files. Within that 28 days, we filed something we called a notice of compliance with the order, stating what matters we were producing and drawing the court's attention, this court's attention if need be, as it turns out it is, to the fact that we were still objecting to the production of personnel files. We placed that of record and made it known. There was a motion for sanctions and a motion to reconsider. Those things were filed. Eventually, the trial court stood on its initial ruling and held my client in contempt, and that's why we are here today. The issue really is twofold. Is this a bad faith appeal and a bad faith contempt? And secondly, was it proper to order these personnel files? With that in mind, let me just start by saying a personnel file, I think, is more accurately described, not so much as a document but as a location. There's nothing in any statute which says all certain things or certain items have to be in a personnel file, and employers, from employer to employer, vary on what they put in those personnel files. It's not something like requesting a lease agreement or a proof of purchase or an employment contract. Those are identifiable documents. An employment file, we've called it the Manila confines, if you will. It is an area or a space where a number of different documents are placed that may relate to the employment of an individual. It could have a job application. It could have a tuberculosis test result. It could have my child's tuberculosis test result because I wanted to show the employer why I was absent for a week. It could have letters of reference, evaluation performances. It could have simply notes that were exchanged for whatever various reasons. There's nothing specific necessarily to an employment file that you will find from one employer to another throughout employment. It's like asking, taken to an extreme, but it's like asking for all documents within the confines of the file, all documents that would be found in a room. There's nothing specific when we ask about an employment file that we're seeking, and that's why I think the Fabiano case called a request for an employment file to be a fishing expedition. There might be something of interest. There might be something relevant. There probably will be many documents or a number of documents that won't be relevant, especially to a material issue in this case because this case involves an injury in a rehabilitation center to a woman's backside. The fact that an employee who saw this woman at some point in care filled out a job application, is it relevant? Is it material is probably even the better question. Is it reasonably calculated to lead to the discovery of admissible evidence? The first objection we made, of course, was the request was not limited properly in scope to a relevant period of time. Thirty-four of these individuals whose files we are supposed to produce were not even employed at this facility at the time of the occurrence. I'm sorry, did I say 34? Because they didn't ask for 34 files. They didn't ask for files where employees were not or did not have any contact with or weren't hired by you during that period or employed by you during that period, and yet they were sent. The extra ten files were sent. And so now you're saying, well, those ten files were sent improperly and you still want them. Am I misunderstanding this? Yes, Your Honor. Enlighten me. First of all, the files have never been sent from my client to the plaintiff. We still have them. Okay. Those are the ones you're bragging about? Yes. I can point you to, let's see, it is in the Apolis, the separate index, I found it handy here, the interrogatories that were asked starting at Appendix A-19. It says specifically who was the nursing home administrator July 2005 to the present time. We then listed four administrators with the dates of employment. The first one was employed at the facility at the time of the occurrence. The next three, Sandra Scott, Linda Cox, and Lori Steele, all have dates of employment starting in 2006, a full year afterwards or later. Are those three administrators included in the ten? Yes, sir. I know that the administrator question did not limit the time period, but the others did. The others would be Director of Nursing, employed July of 2006, a full year afterwards. There were one, two, three, four, five of those. Those files are at issue, and we've been asked to produce those. Let's see. The others were EFG&H, medical records technician, a wound care specialist, a medical director, physician, and a wound care physician, which I believe is the same individual. So there are 34 individuals who have been named by name in the request to produce. Of those 34, ten of them were never employed there in July of 2005. Their employments all began afterwards, and yet have been ordered to produce those. We objected right off the bat to this kind of a request, and the objection has been overruled. This is one of the reasons why we're here today. We have ten individuals whose employment files have nothing to do with this case and could possibly not. Is this kind of a red herring, though? I mean, because you haven't produced the other 24. We haven't, no. I'm sorry, your question? I mean, you haven't produced the other 24. It's not like you're saying these ten are irrelevant. Give us relief here, Judge. Right. You're saying these ten are irrelevant, but we're not going to give you any of the 34. Right. And the reason why we're doing that, we all know that discovery requests need to be narrowly tailored. It's not just proper to send a discovery request to a rehabilitation center, a nursing home, saying, please give us all of your files. All of the files certainly is much too broad of a request. Do you have a problem with the 24? Yes. What's the problem with the other 24? Okay. The problem with the other 24, can I give you an example? Let's say if I had been here a few years ago and I tripped and fell on your stairs, all right? I sue the state of Illinois for my injury that it's caused, that resulted, and I ask who was employed in the appellate court at that time, and the attorney general defending the case in the court of claims says, well, we had so many appellate justices, we had a bailiff, we had a clerk, and I say, I'd like all of those files, all the personnel files. Justice Carter's personnel file is not relevant to that, even if he was employed at the time. There are many things I assume. What's your objection to the individual 24? Do you have specific objections? Yes, Your Honor. It is, in the Fabiano case, the fishing expedition not reasonably calculated to lead to the discovery of invisible evidence. Have you individually tailored your objections to those of the 24 that you have a problem with? You have as to these 10, but what's the specific objection to us? Enumerate the objections to some of the 24. The objection is that the request is overly broad, not tailored to this particular case. One does not need everything in a personnel file. If one is interested, for example, in a criminal background check, we can be asked to produce a criminal background check, and we will have to do so. An employee file, though, as the case of the appellate court first district in Fabiano v. City of Palos Hills says, when you request an employment file in a situation like this, it is so overly broad. I'm not inventing the fishing expedition nomenclature here. That was the appellate court. And here's why. If this case was an employment case, all right, where, say, we had a contract of employment, I could be terminated for cause. Thank you. And cause is defined as three write-ups in my personnel file. The personnel file is at issue then, isn't it? Well, let me ask the question differently. Yes. Is there anything in these 24 files that you don't object to? Wow. Good question. Because, unfortunately, the trial court did not take its responsibility to look at that. Respond to that question. Okay. I'm sorry. Is there something there? Of the 24 that were employed at the time period in question, are there matters in that thing that you don't object to sending to the other side? Probably so. Why haven't you sent that to the other side? Because that wasn't the request. The request was for the entire file. It was, with the exception of any medical records that might be in the file. You know, sometimes maybe I'm wrong on this, but it seems to me that the approach is the opposite of what normally the approach is in discovery. Discovery is generally very broad, and anything relevant or things that could lead to something that's irrelevant. Typically, if somebody has a problem with a discovery request, they make a specific objection to what that request is. But what you're doing is taking the one case and just objecting, period, saying, until they tailor the request a little bit better, we're not going to provide you anything. Well, there are some things that you can't possibly object to that would be, that even you would say would be relevant, and you haven't submitted those to the other side. Your Honor, I respectfully disagree, and I cannot concede that point for you. When you say that what is usually done is this procedure, Fabiano v. City of Palos Hills, I strongly encourage a really good look at that case, because that is just the opposite of what you're saying. There, the request was for a parties personnel file. A party, and these individuals are not parties, and they're not even designated as trial witnesses yet. A parties private personnel file, which the Illinois General Assembly has said is a private matter, and if you disclose that under certain circumstances, you have to give that employee notice. This is not just a piece of paper that we have lying on a desk. Fabiano said, when you ask for that, it is, in quotes, a fishing expedition. Well, I don't think Fabiano destroys all the discovery procedure that we have in the state. I mean, at the trial level, the encouragement is not to, first off, not to bring everything to the trial judge. I mean, I heard a lot of discovery requests over the years, and generally people are trying to cooperate and give each other the stuff that's not going to be a problem. And it's not, typically you don't go to the wire on everything. I mean, there are some things that can't be a problem, and that's what I'm having a hard time understanding, that part of it. In the motion to compel, there were probably, I don't know, 10 to 20 different things. We did come to terms on all but this one. Within these files? No, no, not within the files. We don't know what's in these files. Honestly, I've never looked at them either. I wish the trial court had. My time is up. If there's something else I can address for you, I'd be happy to do so. Otherwise, I thank you for your careful consideration of the Fabiano case. Good morning, Your Honors. I'm David Montaleo, and I represent Amcorp Investment Group on behalf of Marta Benson. The nursing home in this case is, first off, urging this court to use and employ the wrong standard of review for Judge Stinas' order. They urge you to adopt a de novo standard of review. Discovery orders are reviewed using a manifest abuse of discretion standard. The discovery orders are not reviewed de novo unless the applicability of a statutory privilege is at issue. The nursing home, in urging this court to use a de novo standard, cites two cases, Norskog and Bono. Bono is a dissolution of marriage case from the Second District in 1998. Both of those cases, I should say, each of those cases involves a statutory privilege. Norskog involved the Illinois Mental Health and Developmental Disabilities Confidentiality Act. Bono involved the Illinois AIDS Confidentiality Act. There is no statutory privilege asserted here. There's no common law privilege asserted here. Are you asking for everything in those personnel files? Absolutely, Your Honor. Why? Well... There have to be some things that even you would say would not be relevant and also would not lead to something that would be relevant. Your Honor, we offered a protective order. We said, first of all, we don't want any tuberculosis records. We don't want any medical information at all. Take that out of the personnel file. So you actually exclude the medical information? So we exclude all medical information. We exclude anything that has to do with the person's medical information. Plus, we agreed not to disseminate any of the information outside of the litigation. And we agreed to return all of the files at the conclusion of the litigation. And for Mr. Miller to say that he doesn't know what's in these files, I find that incredible because he brought the files to court when he asked Judge Steinitz to conduct the in-camera review. He had the files. Well, he's indicating he didn't look at them. He's indicating he didn't look at them. I'll take him at his word. Well, what do you think are in the files? I know what's in the files, Judge. Okay, what's in the files? I know what's in the files because I assume that the nursing home has complied with the Illinois Administrative Code, which categorizes the things that must be in the employees' files. So why don't you enumerate those? disciplinary measures involving patient care, prior employment histories, educational background, and criminal background. This is 77 Illinois Administrative Code section 300.650. Now, are all those items that you just enumerated, would they all be relevant and or lead to something as relevant? Absolutely. Absolutely, Judge, because when we – we did not develop this list of 34 individuals. The list of 34 individuals was developed by Mr. Miller in response to a written interrogatory that asked to provide the names of – or provide the – yeah, provide the names of people who provided care to Marta Vinson while she was in the nursing home, people who witnessed the care and treatment provided to Marta Vinson, or who reported or acted upon any incident or injury involving Marta Vinson, or who were administrators at New Beginnings. Now, Justice Litton used the phrase red herring about these 10 files for people who weren't employed there. Mr. Miller never raised that in the trial court, never raised that as to – as an objection in the trial court. Are you asking for those 10 files? Absolutely, Judge, because the case law says that failure to raise an argument below results in waiver, especially when the appellate court is reviewing a contempt order based on noncompliance of a discovery order. Now, let's back up. What is relevant or would lead to something that's relevant of people who were never employed during this time period in question in your lawsuit? First of all, Your Honor, there has never been any type of affidavit that says that 34 – or that 10 of the 34 were not employed there. But if they – again, if these 10 people were employed a year after this person was there, what possible relevance or what would lead to something that's relevant as to those 10? It sounds like, and I'm hearing for the first time, that some of these 10 were administrators. If there were subsequent remedial measures that were instituted at the facility, at the nursing home, after Marta Vinson's injury because of her injuries, and if the nursing home later makes an argument that it wasn't feasible to do anything more for Marta Vinson than we already did, then evidence of those subsequent remedial measures comes into existence, comes into play, and is admissible. And so, clearly, that administrator's education, training, and experience, whether they were even qualified – That's only three of the 10. I mean, you're talking about the administrators. I can understand that. But what about the other seven? What about the nurses they – Your Honor – – worked there for two years after she – All I know that has been stated under oath in response to written interrogatory was that we asked for the names of people who provided care, who witnessed the injury, who reported the injury, or who acted upon the injury. There was never an objection under oath that there were 10 individuals of the 34 that they provided, that they listed in response to that interrogatory, that these people didn't even work there. So – Well, how would you even know they didn't work there? You didn't identify them. They identified them. They identified them. So, I mean, I don't even know where we're going down that road. They gave you the names in answers to very specific questions. That's right. Okay. If you look at those questions, you could infer reasonably they're discoverable. Now, I have a question. Yes, sir. You then asked for personnel files, but you're saying the statute requires these categories of information to be in a file. Am I correct? Yes, sir. And you're saying that those categories of information are discoverable that would lead to relevant discovery. Yes, sir. Okay. Why did you not request those categories specifically as opposed to generic personnel files? The Illinois Administrative Code requires the – I should say we modeled our discovery requests along the lines of the way – the phrasing used in the Illinois Administrative Code that governs nursing homes. The language in the Illinois Administrative Code requires the maintenance of personnel files for a period of five years after an accident or injury so that the department can review them. We'd like to review them, and that's why we patterned our request. We patterned our language after what's found in the Administrative Code. They use the phrase personnel files, and they list broad categories of things that must be maintained in the personnel files. We parroted the same language. You actually put in those specific items in the personnel file in your request? No. Because the Administrative Code says that the personnel files must be maintained, and then later on they say, and by the way, these are the things that must be maintained in the personnel files inter alia. And so we asked for the personnel files rather than every subcategory of things. But again, this is an argument that was never raised in the trial court, never raised in response to an interrogatory, never heard by Judge Steinis, and is heard for the first time here. We're hearing for the first time here that there are 10 people who didn't work there. Judge Steinis never heard that. There's never been an affidavit to that effect. There's never been an answer under oath to that effect. You said of the enumerated items that you've just been talking about and which you responded to my questions about, you said you're not asking for their health files. Absolutely. And so to follow up on Justice Holden's question, if you had enumerated what you wanted and excluded something, that might have been a little bit better. Well, Your Honor, again, the nursing home, despite multiple briefings over a 10-, 12-month period and three oral arguments, the nursing home never offered a scintilla of evidence found in those personnel files at all. Perhaps if they had made a conciliatory gesture like that, Mr. Monteleone will give you the employment application, will give you their educational background, will give you their disciplinary record, will give you their criminal background check, will give you their performance evaluations, perhaps I would have said and Judge Steinis would have said that sounds like a reasonable compromise and we wouldn't be here today. But instead, the nursing home decided to make a hard stand and not give us the first piece of paper for any of the files. As far as the in-camera review, Your Honor, it sounds like you at one time or for a long time you were a trial judge. You can't possibly conduct an in-camera review of everything that comes, every discovery request. And that's what Mr. Miller is asking for on behalf of the nursing home. He's faulting Judge Steinis for not conducting an in-camera review. In our brief, first of all, this issue is waived because it's raised for the first time in a motion to reconsider. The case law says an argument is deemed forfeited on appeal if it's raised for the first time in a motion to reconsider. Whether or not an in-camera inspection has occurred had nothing to do with the nursing home's decision to disobey Judge Steinis' order. Judge Steinis' order came on December 3rd of 2009. They didn't make a request for an in-camera review until February of 2010. How many letters went back and forth between the two sides trying to work out the discovery before you brought it before the trial judge? As far as 201K conferences? Trying to work that out between the two of you. Your Honor, off the top of my head, I don't know. I can say this. It was a protracted affair over many months involving multiple briefings, three oral arguments. I'm not talking about what happened before. I understand, Judge. As far as the 201K conference history, I'm not prepared to answer that. You're mandated to try to, both sides are mandated to try to work this out before you bring it before the trial court. Because that's not an issue, I assume that we, sorry, I assume that we complied with the mandates of Supreme Court Rule 201. On the other question with regard to, you know, they identified a certain number of people. Now, as you heard in his argument, the other side is suggesting that with regard, for example, to the administrators that were employed after the time in question in 06 and beyond and the other members, that was because of specific requests you made about administrators and all the administrators from a starting date to the present. You made a broad request. That's why they say they're including these other ten because of your request with fraud. Again, Judge. Is that correct? That's correct. That's their claim. That's their claim. And I urge this court to not substitute its judgment for the judgment of Judge Steinis. I remind your honors that this argument was not made below. Counsel, you have two minutes. I'd like to spend. I'd like you to. Sure. Fabiano involved the police officers' records that were being sought. The appellate court affirmed the trial court in that case on two grounds. They applied the manifest abuse of discretion standard in affirming the trial court, and they said that the party seeking the records offered no argument as to why they might be relevant. Those are the two grounds where, see, in Fabiano, the trial court said you can't have these police officers' personnel files. The appellate court affirmed the trial court because they said, first of all, it's the abuse of discretion standard we're applying, and second of all, the party seeking the police officers' records made no argument as to why they might be relevant or lead to the discovery of relevant evidence. If I could spend my last moment on the reason why Judge Steinis' decision to find a bad faith contempt as opposed to a friendly contempt. Judge Steinis entered an order on December 3rd of 2009, gave Mr. Miller until January 6th of 2010 to produce the records. Mr. Miller files an Orwellian notice of compliance where he said we're not going to comply, but he called it a notice of compliance where he simply re-argued the case. He didn't ask the judge to reconsider the decision. He didn't ask to be held in friendly contempt. He has, to this day, he has never asked to be held in friendly contempt. The contempt citation came only after the plaintiffs filed a motion for sanctions. Thank you, Your Honor. Thank you, Counsel. May it please the Court. There's been some suggestion that we somehow waived, that there were 10 employees that are not at issue whatsoever, and that employee files by their very nature are nebulous and not reasonably calculated to lead to any specific evidence. I just think that's patently untrue. Our argument, our objection is, first, the request for personnel files from year 2003 to present is not reasonably restricted in time. Well, that addresses the employees that were either hired and left before 2005 or that weren't hired until after 2005. Of the 35 that you've identified, and as, you know, you're objecting to everything in the personnel files, everything right now, and you identify 10 as not being employed during the relevant time period, those 10 are all afterwards, right? I believe there may have been some nursing home administrators that were before, but the vast majority of them are afterwards. For instance, nursing home administrator Sandra K. Scott employed 6-16-06 to 7-11-06. Linda Cox, 7-06 to 11-17-06. Who was employed before and quit before the relevant time period? I don't have that in front of me immediately, Your Honor. One of the interrogatories, the question was from 2003 up through the present. I had nothing to do with the administrators. Right, and I for some reason thought that there were some that maybe started around 2003 and were gone before 2005, but really whether they were hired before or after, they were never employed at the time that this woman was at the facility, so there's no possible way that anything in there could be relevant. Was there some kind of a scrivener's error or something that these 10 names, or at least 7 of the names, were included? In our responses? And now you're saying, you're not saying that. I mean, you're not saying we made a mistake, we typed in 7 more names than we should have. I'm not sure this is really relevant to the issue because there's still 24 that you haven't given anything. Right, no, I believe that it is relevant. For instance, interrogatory number 18, for the period of July 10, 2005 to present, state the name, current address, professional license number, title, and dates of employment for the following, and then it lists a bunch of different occupations. Well, we went ahead and responded to that, and I think that we're being faulted on the one hand for objecting to things, and then we're being faulted for kind of in the spirit of cooperation, all we're doing is putting forth some names and we put the dates of their employment right in the answer to interrogatory, so you're reading the answer and you see, wow, this person was not employed at the relevant time. If I'm going to propound a request to produce based on these, perhaps I should leave that off. So it wasn't an error that we included it, it was just in the spirit of cooperation, and just stating their name I don't think is saying that we believe that they are relevant to this case, absolutely, and that everything in their file, no matter what that is, could be credit checks, could be their family histories. You didn't make specific objections to anything, did you? You didn't say that we'll submit the hiring data, the background check, but not credit checks, not medical files. You didn't say that, did you? No, Your Honor, we did not. And that was something that was also brought up before that I wanted to address, that perhaps we should have just whittled down and given them some information. Well, I think as contentious as this has been on the record of this case, I just don't think that that would have landed us anywhere else. As counsel has stated, they want all of the files, and they want everything in those files. What do you say to counsel's argument that in rehabilitation, you know, the remedies that they, if future administrators after this time period change some policy, they believe that they can get some of that into evidence? As far as subsequent... Well, as far as subsequent remedial measures, Your Honor, I don't think that that's going to be admissible. There's a policy against admitting evidence to that extent so that people can improve their practices. It's not an indication of negligence. You're talking about admissible in a courtroom.  But not necessarily for purposes of discovery. Correct. But because those certain items may be contained in a file or, you know, a regulation says that it will be in the file, it's just not a reason to produce the entire file. Let me ask you briefly to speak to the contempt issue. Well, I think that we absolutely did bring up the possibility that we were going to seek contempt as soon as the trial judge ruled against us. It's in the transcripts. It's clearly cited in our brief. And there were many occasions where counsel said, well, we're not agreeing with this order, and we are planning to, unfortunately, the procedure in Illinois is to have to draw that contempt. It's true that it was taken as a response to a motion for sanctions. But there's no procedure that I'm aware of that says exactly how the contempt has to be drawn. Thank you. Court is about to stand at recess for a panel change.